Argued December 13, 1935; modified February 25; rehearing
denied March 24, 1936

SMITH *v.* KAY ET AL.
(54 P. (2d) 1160, 55 P. (2d) 794)

*William Ganong,* of Klamath Falls, for appellants.
*J. H. Carnahan,* of Klamath Falls, for respondent.

BAILEY, J. This proceeding, in the nature of a creditor's bill, was instituted on July 24, 1934, by G. E. Smith as plaintiff against E. G. Kay and Chester H. Kay and Katherine Kay, his wife, to have set aside, as in fraud of creditors of E. G. Kay, a deed to certain

real property and a bill of sale of furniture in the apartment houses on said real property. These instruments purported to convey the real property and to transfer ownership of the personalty from E. G. Kay to his son, Chester H. Kay. From a decree in favor of the plaintiff the defendants have appealed.

In 1923 the defendant E. G. Kay purchased a lot 120 feet on Eighth street by 65 feet on Lincoln avenue in Klamath Falls, of which a 10-foot strip parallel with and at the opposite end of the lot from Lincoln avenue was dedicated to the city for alley purposes. Three two-apartment houses were built on this lot between the time of purchase and 1926, and one of these apartment houses, on the corner of Eighth street and Lincoln avenue, together with a tract of land 36 feet, 8 inches, by 65 feet, was deeded by E. G. Kay to his wife as part of a property settlement upon their being divorced. This was known as the northwesterly third of the tract and it comprised exactly one-third of the lot owned by the husband.

From the record it would appear that in about 1926 E. G. Kay borrowed the sum of $5,500 from the Equitable Savings & Loan Association and secured the same by giving a mortgage on the southeasterly one-third of the tract for $3,000 and on the central one-third for $2,500. In the latter part of 1931 there was still owing to that association in excess of $3,300, but it does not appear definitely whether the amount then owing was due on one mortgage or two. The amount of monthly payments including interest and installments of principal which the mortgagor was obliged to pay was $66.72. For several months he had been unable to meet the monthly installments. During part of that period he paid interest only, and sometimes he was unable to pay the interest in full.

The two-thirds lot retained by E. G. Kay had thereon, as before stated, two apartment houses, each one originally containing an upper and a lower apartment. The building next the alley was altered in 1930 so as to contain two apartments on the ground floor. Each apartment in these two structures had separate street numbers. E. G. Kay, from the time of the construction of the building on the alley, had made his home in one of its apartments.

The total monthly rental of the apartments, other than the one occupied by E. G. Kay, amounted to something like $78. Mr. Kay's apartment last rented at $12 a month. In addition to the monthly installment on the mortgage the owner of the buildings was required to furnish water and to supply heating for water for all apartments, the average monthly cost of which was $20. Taxes were in the neighborhood of $137 annually. And in addition to these charges were insurance and expense of upkeep.

E. G. Kay was out of employment and found the income from the two buildings insufficient to meet the monthly installments and other expenses. He therefore attempted to have the Equitable Savings & Loan Association reduce the monthly payments on the mortgage or to make a new mortgage calling for smaller monthly payments, but was unsuccessful. He also attempted to dispose of the property but could obtain no offers for it. His son Chester, who was then married and living in San Francisco, on learning of his father's predicament suggested that he ascertain whether the son could obtain a veteran's loan from the state of Oregon. He had enlisted from Oregon and had procured a cash bonus several years previously, based on military service. Upon investigation it was found that the son was entitled to a loan upon condition that the

amount of the cash bonus given him be repaid, with interest. Accordingly, the southeasterly one-third of the tract, where the father made his home, was in February, 1932, deeded by the father to his son, and thereafter application was made to the state of Oregon for a loan of $3,000, the maximum allowed by state law, and this tract of land was offered as security. The maximum which the state would consent to loan on it was $1,800, and early in April, 1932, the father conveyed to his son by separate deed the central third of the lot, which was described as a tract 36 feet, 8 inches, by 65 feet. Thereafter the state consented to a loan of $3,000 on the property included in these two deeds, that is, the southeasterly two-thirds of the lot, upon condition that the son repay out of the loan the veteran's bonus which had previously been given him, together with the sum of $75.88 as interest. The expense of effecting the loan was $41.30, and the net amount after deducting that sum, the cash bonus and the interest thereon, was $2,733.12, to apply on the existing mortgage, which by that time totaled $3,358.14.

The difference between the amount available from the veteran's loan by the state and the amount of the existing mortgage was $625.02. On or about May 23, 1932, $500 of this amount was furnished by Erma K. Austin of Seattle, a married daughter of E. G. Kay. It was claimed by Chester Kay that this money was loaned to him for use in refinancing the father's property here involved, and that he was responsible for repaying it. Two checks of Katherine Kay, for $75 and $25, dated respectively August 17 and August 23, 1932, provided $100 of the balance, and the remainder was paid by Chester Kay. The transaction with the veterans' state aid commission was completed on or about August 8, 1932.

During the month of May, 1932, Chester Kay and Katherine Kay, his wife, executed a deed sent to them by the elder Kay or his attorney, reconveying this property to the father. This was before the state loan had been completed. According to the father's testimony, upon receipt of this deed he was advised by the attorney that it should not be accepted by him and recorded, for the reason that the rate of interest and installments payable on the state loan would be increased when the property was conveyed by the veteran to some one else. He further testified that he had in mind at the time he sent the deed to his son that the property would be reconveyed to him and he would thereupon convey the same to his son and daughter, an undivided one-half interest to each. In compliance with the attorney's advice he destroyed this deed from his son and sent to him a second deed whereby the son was to convey directly to his sister an undivided one-half interest in the property. Apparently this deed was intended to be executed in May, 1932, but was not executed or acknowledged until August 6 of that year. Thereupon it was sent to E. G. Kay, who did not record it and did not advise any one interested in this proceeding of its existence.

On January 4, 1932, E. G. Kay executed a bill of sale to his son Chester of all the furniture and fixtures contained in the two apartment houses, which bill of sale was filed of record on March 13 of that year. Chester Kay, however, did not know of this bill of sale until after he reached Klamath Falls for the trial of the case. His father stated that he was contemplating a trip to Mexico and that the bill of sale had been prepared in case anything might happen to him on that journey.

Both the elder Kay and Chester testified that at the time the latter consented to apply for a veteran's state loan it was agreed that he was acquiring the ownership of both the real and the personal property in consideration of his using his right to procure the state loan and paying the difference between what he obtained on that loan and the amount necessary to pay off the Equitable Savings & Loan Association's mortgage. E. G. Kay, however, testified during his examination that the personal property was to be transferred to his son as security. The son testified that he did not have any idea of the value of the real property, that he did not know whether it was worth $4,000, $20,000 or any other amount.

It was also understood between father and son that the father was to continue to live in one of the apartments, look after the property, collect the rents, make the annual payment of $180 to the state on the loan, pay other expenses in connection with the operation of the apartment houses, and retain the surplus rental to do with as he wished.

On April 6, 1934, certain furniture and fixtures of one of the tenants were bought on conditional sale contract for $200. The vendee's name was signed as "C. H. Kay, by E. G. Kay". There was no down payment and the document contained a statement as follows: "Agreed by both parties that the extra rent on the apartment shall pay out this contract in approximately twenty months." The only payments on this furniture had been made by the father out of the rents received from the property. There was certain other furniture, amounting to some $55 in value, claimed to have been purchased by the son after the real property was conveyed to him.

The testimony introduced by the plaintiff tended to show that the real property was of the value of $9,000 to $11,000 and that the personal property thereon was worth from $600 to $1,000. The circuit court found that the value of the real and personal property together, at the time of commencement of this suit and on May 5, 1932, was $9,500.

The plaintiff herein on July 24, 1934, instituted an action in the circuit court for Klamath county against the defendant E. G. Kay to collect approximately $1,600, of which $875 represented principal and interest of a note from that defendant to the plaintiff for money borrowed to complete the apartment houses. Another item, $345, was due to Balin for furniture purchased for and used in the apartments, and there was a note to one Coseboom for over $400, principal and interest, for money used either in the alteration of one apartment house or for buying furniture and fixtures. The Coseboom and Balin note and account were assigned to the plaintiff Smith. The defendants admit the correctness of these various accounts, the exact amount of which we do not here attempt to state.

Upon the institution of the law action a writ of attachment was issued and the real property and furniture and fixtures in the apartment houses were attached. No judgment was entered in that action until after the court had concluded the taking of testimony in this suit. The decree herein was entered on March 27, 1935. There appears in the record in this suit, as an exhibit, a copy of the proceedings in the law action, together with a copy of the judgment therein dated March 26, 1935, all certified by the county clerk.

It is contended by the defendants that the real property on which these two apartment houses are located constituted the homestead of E. G. Kay at the time of

the conveyance by him to his son, and that since the value of the property, as shown by defendants' witnesses, was not at that time in excess of $3,000, over and above the amount of the mortgage of the Equitable Savings & Loan Association, the creditors of the elder Kay could not in any event have been defrauded by the conveyances. The plaintiff, on the other hand, contends that this property at the time of the conveyances from father to son had a value greatly in excess of the then existing mortgage on the property, to wit: a value in excess of $9,500; that the conveyances were made for the sole purpose of defrauding the plaintiff and his associates; that since these conveyances were made with such fraudulent intent the elder Kay lost any homestead right which he might otherwise have had in any of the property; and that his homestead right in any event could not have extended beyond the house in which he had his abode.

We are convinced from the entire record that the two conveyances, one for each apartment house and the land on which it stood, were not intended by the father and Chester Kay as absolute conveyances of the real property described in the deeds; and that the father was intended by the transaction between him and Chester to retain ownership of the property and the beneficial use thereof, subject only to the mortgage to the veterans' state aid commission and the amounts which had been advanced by or at the request of the son. No change whatever, after these conveyances, was made in the management of the property or the use of income from it. Chester Kay admitted that his father was to have the use of the property and the surplus of income from it, and that he himself had no idea as to the value of the real or personal property. He paid nothing and agreed to pay nothing to his father

as a consideration for the conveyances. The use which the father was to have of the property is not asserted by either the father or the son as intended to be compensation for the father's homestead right or of his interest in the property.

All the correspondence between father and son concerning negotiations leading up to the conveyances by E. G. Kay to Chester had been destroyed, although not, apparently, by intention. The son as a witness exhibited complete forgetfulness as to some of the important details of the execution of the two deeds by himself and his wife, one to his father and the other to his sister, and of many incidents connected with the various transactions.

As hereinabove stated, it is contended by the defendants that the deed of reconveyance from the son to the father was for the purpose of permitting the father to convey an undivided one-half interest each to his son and daughter. That fact, together with the subsequent execution of a deed from the son to his sister of an undivided one-half interest and delivery thereof by the son to the father, who still retains it, would tend to show that the son did not undertake to purchase this property from his father. The entire transaction was intended to assist the elder Kay in refinancing the lien on the property so that the apartment houses could be retained for his use and benefit.

We conclude, also, that the furniture claimed to have been purchased by or on behalf of the son, one item of $200 and the other of approximately $55, was in fact purchased for the benefit of the father, and that the money which has already been paid on the purchase price of that furniture was paid out of income from the apartment houses.

■■ The defendant E. G. Kay at the time this suit was instituted was making his home in one of the apartments in the building on the southeasterly third of the lot, and had been living there for some years. The fact that the building also contained other apartments which he rented to tenants did not preclude him from claiming a homestead exemption therein and in the land on which it was located, as it was his home and the place of his abode: *Moody v. Baker,* 142 Or. 559 (20 P. (2d) 1069). Nor would the fact that he was unmarried deprive him of the right to claim a homestead, inasmuch as the law no longer requires that one be the head, or a member, of a family in order to be entitled to a homestead exemption: § 3-201, Oregon Code 1930; *Kaller v. Spady,* 148 Or. 65 (34 P. (2d) 663).

■ If the purported transfer of the real property from the father to the son should be held fraudulent as an attempt to defeat claims of creditors, nevertheless, upon the setting aside of such conveyances, the elder Kay would be entitled to assert his claim of homestead in the property: *Stewart v. Black,* 143 Or. 291 (22 P. (2d) 336). At the time the one-third lot adjoining the alley was attempted to be transferred by the father to the son the father undoubtedly had a right to claim a homestead in the two-apartment house on the land so conveyed, and was undoubtedly entitled to as much land around said apartment house as was described in the deed, to wit: a tract of land 36 feet, 8 inches, by 65 feet.

It is claimed by the defendants that E. G. Kay's right to claim a homestead extends not only to the apartment house in which he lived but to both apartment houses owned by him and the two-thirds lot upon which they were located. To fortify this contention it is maintained that the entire tract of land in the

ownership of E. G. Kay was less than an ordinary city lot, and that he should be entitled to claim a homestead in a tract of land equivalent to at least one city lot, regardless of how the property was used, so long as he resided upon part of said lot.

From 29 C. J., p. 832, § 116, we quote the following:

"Unless there is some express provision to the contrary, a homestead includes not only the dwelling house and land on which it stands, but everything appurtenant thereto which may be used and is used for the more perfect enjoyment of the home. It includes lots or parcels of land used by the homestead claimant and his family for purposes immediately connected with their residence and the enjoyment of their homestead exemption; outhouses and stables for servants, stock, or personal property; yards; family orchards; gardens, unless their use is merely occasional and incidental and not primarily for securing products for home consumption, or unless the garden is a rural tract and the residence property urban; a store-house erected on a lot purchased with the proceeds of the sale of a homestead; fixtures permanently annexed to the soil; and easements."

In the same section, with reference to what is not included in a homestead, it is said:

"Property can not be considered appurtenant unless it is used principally and in good faith for homestead purposes. The homestead must center in and about the dwelling house and does not extend to any part of the real estate beyond that portion of the dwelling and land used in connection therewith and within the value fixed by the statute. A debtor can not cover his premises with trade buildings and claim all as exempt. Appurtenances will not include a building used for a store-house and an occasional working place, a blacksmith's shop not used in connection with the residence, other land not adjoining the home tract from which the debtor obtains fuel, a grist mill, not enclosed

with the main homestead, a stable used in carrying on the business of a hotel where the homestead is established in the hotel, or a building on the premises in which claimant operated an illegal business.''

In the case at bar, the apartment house located on the central tract was not in anywise used in connection with the house in which the defendant E. G. Kay made his home. It could not be considered as appurtenant to his home. The fact that the father had previously transferred the northwesterly one-third of the lot to his former wife and originally conveyed to his son only the southeasterly third of the lot is some indication that he intended, when he constructed the buildings, that the lot was to be treated as divided into three separate parcels of land, each parcel to be used in connection with the house located on it.

■■ In determining how much land is appurtenant to a dwelling house it is necessary to consider the use to which the land is put, rather than the quantity of ground owned by the homestead claimant. Under our present law the maximum quantity of land, in a city or town laid off in blocks and lots, that can be claimed as exempt from sale on execution is one block: § 3-202, Oregon Code 1930. This does not mean, however, that the homestead claimant may assert a right to have an entire block exempt, if the value thereof does not exceed $3,000, regardless of the use to which the property is put. See, in this connection: *Wapples on Homestead and Exemption*, pp. 182-184 and 232-238; *Maloney v. Hefer*, 75 Cal. 422 (17 P. 539, 7 Am. St. Rep. 180); *Hoitt v. Webb*, 36 N. H. 158; *Casselman v. Packard*, 16 Wis. 114 (82 Am. Dec. 710); *Watson v. Manning*, 56 Okla. 295 (156 P. 184); *In re Ligget*, 117 Cal. 352 (49 P. 211).

Section 3-201, *supra*, provides that the "homestead must be the actual abode of and occupied by the owner,

his or her spouse, parent or child''. Prior to the amendment of the homestead law in 1919 it was provided that, if the homestead was located in a town divided into blocks and lots, ''in no instance shall such homestead be reduced to less than . . . one lot, regardless of value'': § 222, L. O. L. We have no such requirement in the present law as to the minimum area to which a homestead may be reduced.

■ Most of the writers on the subject, and the adjudicated cases involving homestead exemptions, point to the fact that there is such a wide divergence between statutes relating to homestead exemptions that it is difficult to apply the decisions of one jurisdiction to the law and facts of cases in another state. We are of the opinion, however, that in the instant case E. G. Kay may not claim a homestead exemption in the central tract of the original lot, and we believe that the authorities hereinabove last cited bear out our conclusion.

■ We further hold that the southeasterly third of the lot was the actual abode of E. G. Kay and that he was entitled to claim a homestead exemption in that tract and the apartment house thereon located.

■ In view of the nature of the conveyances of the real property and the transfer of the personal property from E. G. Kay to his son Chester, and the subsequent acts of the parties in relation to the transaction and the use of the property, the conclusion is inevitable that the transfers were for the purpose of hindering, delaying and defrauding the creditors of the senior Kay. Therefore, the deeds of conveyance and the bill of sale to Chester Kay from E. G. Kay should be set aside.

■ Under the facts shown in the case we think it equitable that the son be given a lien on the real and personal property for the $625 advanced by him, less the amount of the cash bonus and interest thereon

repaid by him to the state: *Marion Automobile Company v. Brown,* 127 Or. 551 (272 P. 914); *Clarke v. Philomath College,* 99 Or. 366 (193 P. 470, 195 P. 822); *Philbrick v. O'Connor,* 15 Or. 15 (13 P. 612, 3 Am. St. Rep. 139). The total amount, then, of the lien to which Chester Kay is entitled is $399.12. The mere fact that he had received a cash bonus and was obliged to repay it together with interest thereon should not in any way affect the situation. He was not entitled to a loan from the state to the full amount of $3,000 and in addition to retain the cash bonus which he had previously been paid by the state.

It is suggested by the plaintiff that, if a homestead exemption be allowed E. G. Kay in the southeasterly third of the lot, the amount of the mortgage could be apportioned between that tract and the central one-third lot. This would undoubtedly not be permitted by the veterans' state aid commission; nor would it be practical. Under the circumstances, the only reasonable procedure to follow is to sell the entire two-thirds lot, subject to the mortgage thereon, together with the furniture and fixtures in the apartment houses, except such personal property as is used by E. G. Kay and is exempt under § 3-207, Oregon Code 1930, in the event that the real and personal property could be sold for enough to pay to E. G. Kay the $3,000 to which he is entitled as an exemption, and to the son the amount of his lien. The interest of E. G. Kay only, in the personal property which is being bought on conditional sale contract or otherwise, should be sold.

It appears from the record that the property exempt as a homestead is of less value than the amount of the mortgage to the veterans' state aid commission and the $3,000 exemption to which E. G. Kay is entitled. It has, however, a greater value than $3,000, according to the

testimony of a number of witnesses experienced in real property values.

In *Boyce v. Hawn,* 52 S. D. 53 (216 N. W. 589), a suit was instituted to foreclose a mortgage on homestead property and other property which was non-exempt. One of the parties to the litigation had held a junior mortgage on the property which was non-exempt and had foreclosed that mortgage and bought the property subject to the lien of the first mortgage. This purchaser then attempted to require the holder of the first mortgage to sell first on execution the homestead property. In denying this relief, the court observed:

"At common law, in marshaling assets and securities the interests of the debtor were not considered. But with the growth of an enlightened public policy saving to the debtor certain property and especially a homestead exempt from forced sale on execution, the doctrine was extended by many states to protect the exemptions of the debtor. The justice of saving the debtor's exemptions from forced seizure by the indirect method of marshaling securities is apparent. Extending to him the benefit of the doctrine is necessary to a full enjoyment and protection of such exemptions. When the exemption right is superior to the rights of creditors, must, of course, depend upon the circumstances of the case. The principles governing are well understood in determining the priorities between creditors, and the same principles can be applied in determining the priority of an exemption claim. Where, as in the case at bar, the homestead character of the land, now claimed by the widow and other heirs, was known long before respondent gained an interest in the N. E. ¼, existed when respondent took a second mortgage and when respondent obtained a fee title subject to the first mortgage, the homestead right is superior to respondent's right (if respondent has any right under the terms of its purchase), and appellants are entitled

to compel plaintiff to first resort to ·the N. E. ¼ for satisfaction of the mortgage and to sell the homestead only in the event a sale is necessary to pay a balance remaining. The extension of the doctrine to include the protection of the homestead exemptions is discussed and maintained in the following cases:'' citing numerous authorities.

See, in addition to the authorities cited in the foregoing case: Annotation in 44 A. L. R., 758; 3 Freeman on Executions (3d Ed.), § 440 at p. 2357; 29 C. J. 877, § 242; 18 R. C. L. 463, § 12.

The principle announced in the foregoing authorities should be applied in the instant case. The acts of defendant E. G. Kay and his statement as a witness have not deprived him of the right to claim a homestead or to evoke the aid of a court of equity to protect him in that right.

Reference has hereinbefore been made to a deed to an undivided one-half interest from Chester Kay to his sister, which had been delivered to the father and retained by him. This deed was not recorded and it is not intimated that the plaintiff had any knowledge of its existence at the time of attaching the property. Nevertheless, since Erma K. Austin, the grantee in said deed, was not a party to this suit, we express no view as to her rights in the real property.

The decree appealed from is modified as hereinabove stated. Neither party is to recover costs.

CAMPBELL, C. J., and BEAN, and RAND, JJ., concur.

## On Petition for Rehearing
### (55 P. (2d) 794)

BAILEY, J. In a petition for rehearing, the respondent, G. E. Smith, asserts that the effect of that part of our former opinion wherein we ordered a sale of the real and personal property in the event that it could be sold for enough in excess of the mortgage against the property to insure to E. G. Kay $3,000, the maximum allowed under the homestead law, and $399.12, the amount of the lien impressed upon the property for money advanced by E. G. Kay's son, is to permit E. G. Kay to look to property other than that in which he is entitled to a homestead, to make up the difference between the value of the homestead property and the statutory maximum of $3,000.

■ All the evidence in the case is to the effect that the property in which the court allowed E. G. Kay a homestead is of greater value than the non-exempt property. The amount of the mortgage to the veterans' state aid commission is $3,000, on the principal of which a small amount has been paid. It covers both the exempt and the non-exempt property. The amount of the son's lien, as above stated, is $399.12, and he is granted a lien on both the personal property and all the real property as security for the payment of that sum.

In the event that the mortgage should be foreclosed at this time and the non-exempt property be first sold to pay the amount of the mortgage and the son's lien, any excess, over and above such encumbrances, realized from the sale of the non-exempt property, would not inure to the benefit of E. G. Kay. Nor, in all probability, would it be necessary, even if it were permitted, for

him to look to such excess of proceeds of sale of the non-exempt property to make up the maximum of $3,000; for, as above stated, the property in which he is entitled to a homestead is of a greater value than the non-exempt, and the maximum to which he is entitled is less than the amount of the two liens.

It is stated in the petition for rehearing that to require the respondent to find a purchaser willing to pay $3,399.12 the aggregate of the homestead exemption and the son's lien, over and above the amount of the mortgage, would in effect preclude a sale of the property and deprive the respondent from satisfying the amount of his judgment of some $1,600 against E. G. Kay. The amount of the mortgage together with the other two items is some $6,300. The court found that the value of the property at the time it was transferred from the father to the son was $9,500. The evidence of respondent's witnesses showed the value to be in excess of that amount. At the time of the transfer there were many vacant houses and apartments at Klamath Falls. But at the time of the trial all the houses were filled and there was a strong demand for dwellings. Also, the value of the property in question had increased over its value at the time of the transfer. In view of these facts there should be little difficulty in finding a purchaser who would buy the property for enough, over and above the mortgage, so that respondent could recover the amount of his judgment after making allowance for the son's lien and the amount of E. G. Kay's exemption.

█ The decree of the circuit court, in conformity to the prayer of the complaint, set aside the transfers of the real and personal property and ordered all the property sold to satisfy the plaintiff's demands. The court in *Bowman v. Sherrill,* 59 Or. 603 (117 P. 1122), in

a proceeding similar to this, said: "A decree, such as is sought in this case, would operate practically as an execution, and we see no reason why this [homestead] exemption should not be claimed and urged in this proceeding." We likewise see no reason why, in this proceeding, in view of the peculiar situation here presented, this court should not prescribe the procedure to be followed upon the remanding of the cause to the circuit court. By so doing it is possible to obviate further litigation of the matter and to preserve not only the right which E. G. Kay has to a homestead but in addition the rights of the creditors. It is altogether probable that the respondent would, under the procedure outlined, recover more on his judgment than he would obtain in the event that the mortgage were foreclosed. And any other procedure which we can conceive would in all probability bring about a foreclosure of the mortgage in the very near future.

Reference is made in the petition to the deed from Chester Kay to his sister, Erma K. Austin, and it is suggested that because this deed has not been canceled it will tend to defeat a sale of the property on execution. Nothing said here or in our former opinion should be so construed as to prevent the circuit court from following such procedure as may be necessary to determine what right, if any, the said Erma K. Austin has in and to the property here involved.

The petition for a rehearing is denied.

CAMPBELL, C. J., and BEAN and RAND, JJ., concur.